C.D. Michel-SBN 144258
Anna M. Barvir-SBN 268728
Tiffany D. Cheuvront-SBN 317144
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Fax: (562) 216-4445
Email: cmichel@michellawyers.com
   *Attorneys for Plaintiffs B & L Productions, Inc., Bardack, Diaz, Dupree, Irick,
   Walsh, Maximum Wholesale, Inc., California Rifle & Pistol Association, Inc.,
   South Bay Rod and Gun Club, Inc.*

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
1645 Willow Street Suite 150
San Jose, CA 95125
Telephone: (408) 264-8489
Fax: (408) 264-8487
Email: Don@DKLawOffice.com
   *Attorney for Plaintiff Second Amendment Foundation*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B & L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST; BARRY BARDACK; RONALD J. DIAZ, SR.; JOHN DUPREE; CHRISTOPHER IRICK; LAWRENCE WALSH; MAXIMUM WHOLESALE, INC., d/b/a AMMO BROS.; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; SOUTH BAY ROD AND GUN CLUB, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> 22nd DISTRICT AGRICULTURAL ASSOCIATION; STEVE SHEWMAKER, President of 22nd District Agricultural Association, in his official and individual capacity; RICHARD VALDEZ, Vice President of 22nd District Agricultural Association, in his official and individual capacity; KAREN ROSS, Secretary of California Department of Food & Agriculture, in her official capacity; DOES 1-50, <br><br> Defendants. | CASE NO: 3:19-cv-00134-CAB-NLS <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Filed concurrently with Request for Judicial Notice, and the Declarations of Anna M. Barvir, Tiffany D. Cheuvront, Philip Y. Okita, Tracy Olcott, Barry Bardack, Ronald J. Diaz, Sr., John Dupree, Christopher Irick, Lawrence Walsh, Shaun Redmon, Richard Travis, Jon Sivers, and Alan Gottlieb] <br><br> Date:  May 1, 2019 <br> Judge:  Hon. Cathy Ann Bencivengo <br> Action Filed:  January 21, 2019 |

1

# TABLE OF CONTENTS

2

**Page**

3

Table of Contents .................................................................................................ii

4

Table of Authorities ...........................................................................................iii

5

Introduction ........................................................................................................ 1

6

Statement of Facts .............................................................................................. 2

7

I.      State-law Regulation of Gun Shows in California ................................. 2

8

II.     The Gun Show Experience ..................................................................... 4

9

II.     The Del Mar Fairgrounds ....................................................................... 5

10

III.    The Crossroads Gun Show ..................................................................... 6

11

III.    Defendants Ban Gun Show Events at the Venue ................................... 6

12

Legal Standards .................................................................................................. 8

13

Argument ............................................................................................................ 9

14

I.      The Moratorium Violates Plaintiffs' Right to Free Speech.................... 9

15

        A.     Plaintiffs Seek to Engage in First Amendment Protected Expression .. 10

16

        B.     The Del Mar Fairgrounds Is a Public Forum ........................... 11

17

        C.     The Moratorium Is a Content-based Speech Restriction ....................... 12

18

        D.     The District's Moratorium Cannot Survive Heightened Scrutiny ........ 14

19

II.     The Moratorium Violates Plaintiffs' First Amendment Right of Assembly... 17

20

III.    The Moratorium Violates Plaintiffs' Right to Equal Protection .................... 18

21

IV.     Defendants Conspired to Violate Plaintiffs' Civil Rights ................................ 19

22

V.      Defendants' Affirmative Defenses Are Unavailing ........................................ 21

23

        A.     Shewmaker and Valdez Cannot Claim Legislative Immunity
               Because Their Actionable Conduct Was Not Legislative Activity....... 21

24

        B.     Plaintiffs Are Entitled to Damages Under 42 U.S.C § 1983................. 22

25

        C.     Defendant Ross Cannot Invoke Sovereign Immunity for the Direct
               Role She Played in the Violation of Plaintiffs' Rights ......................... 24

26

Conclusion.......................................................................................................... 25

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................... 9

*Ark. Writers' Project v. Ragland*,
481 U.S. 221 (1987) .................................................................................... 12

*Ashcroft v. Am. Civil Libs. Union*,
535 U.S. 564 (2002) .................................................................................... 12

*Ashcroft v. Am. Civil Libs. Union*,
542 U.S. 656 (2004) .................................................................................... 12

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...................................................................................... 14

*Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) .................................................................................... 18

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................ 15

*Cal. Med. Ass'n v. FEC*,
453 U.S. 182 (1981) .................................................................................... 14

*Canalis v. San Joaquin Sheriff's Posse Comitatus*,
641 F.2d 711 (9th Cir. 1981) ...................................................................... 20

*Carey v. Brown*,
447 U.S. 455 (1980) .................................................................................... 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................... 9

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984) ................................................................ 12, 22

*City of Madison v. Wis. Employment Rels. Comm'n*,
429 U.S. 167 (1976) .................................................................................... 12

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
 473 U.S. 788 (1985) .................................................................. 9, 10, 11

*DeJonge v. Oregon*,
 299 U.S. 353 (1937) .......................................................................... 18

*Doe v. Lawrence Livermore Nat'l Lab.*,
 131 F.3d 836 (9th Cir. 1997) ............................................................ 23

*Doe v. United States*,
 419 F.3d 1058 (9th Cir. 2005) ............................................................ 8

*Edwards v. City of Coeur D'Alene*,
 262 F.3d 856 (9th Cir. 2001) ............................................................ 16

*Frisby v. Schultz*,
 487 U.S. 474 (1988) .......................................................................... 16

*Gitlow v. New York*,
 268 U.S. 652 (1925) ............................................................................ 9

*Griffin v. Breckenridge*,
 403 U.S. 88 (1973) ............................................................................ 19

*Grutter v. Bollinger*,
 539 U.S. 306 (2003) .......................................................................... 15

*Hafer v. Melo*,
 502 U.S. 21 (1991) ............................................................................ 24

*Hunt v. City of Los Angeles*,
 601 F. Supp. 2d 1158 (C.D. Cal. 2009) ............................................ 11

*Hustler Magazine v. Falwell*,
 485 U.S. 46 (1988) .............................................................................. 9

*ITSI TV Prods., Inc. v. Agric. Ass'ns*,
 3 F.3d 1289 (9th Cir. 1993) ........................................................ 23, 24

*Kaahumanu v. County of Maui*,
 315 F.3d 1215 (9th Cir. 2003) .................................................... 21, 22

*Life Ins. Co. of N. Am. v. Reichardt*,
 591 F.2d 499 (9th Cir. 1979) ............................................................ 20

iv

TABLE OF AUTHORITIES

*Long v. Van De Kamp,*
    961 F.2d 151 (9th Cir. 1992) ........................................................ 24

*Loving v. Virginia,*
    388 U.S. 1 (1967)........................................................................ 18

*Madsen v. Women's Health Ctr. Inc.,*
    512 U.S. 753 (1994) ................................................................... 15

*McCullen v. Coakley,*
    573 U.S. 464 (2014)................................................................... 15

*McCutcheon v. FEC,*
    572 U.S. 185 (2014)................................................................... 15

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1959) ............................................................. 17, 18

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) ............................................... 13, 17

*Nordyke v. Santa Clara Cnty.,*
    110 F.3d 707 (9th Cir. 1997) ................................................. 13, 17

*Perry Educ. Ass'n v. Perry Local Educator's Ass'n,*
    460 U.S. 37 (1983)........................................................ 11, 12, 24

*Planned Parenthood of Idaho, Inc. v. Wasden,*
    376 F.3d 908 (9th Cir. 2004) ..................................................... 25

*Police Dep't v. Mosley,*
    408 U.S. 92 (1972)............................................................... 12, 18

*Porter v. Jones,*
    319 F.3d 483 (9th Cir. 2003) ....................................................... 8

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)................................................................... 14

*Reed v. Town of Gilbert,*
    __ U.S. __, 135 S. Ct. 2218 (2015)..................................... 12, 13, 14, 15

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................... 13

v

*San Pedro Hotel Co., Inc., v. City of Los Angeles*,
  159 F.3d 470 (9th Cir 1998) ................................................................ 21

*Schultz v. Sundberg*,
  759 F.2d 714 (9th Cir. 1985) ............................................................... 20

*Se. Promos., Ltd. v. Conrad*,
  420 U.S. 546 (1975) ............................................................................ 14

*Sever v. Alaska Pulp Corp.*,
  978 F.2d 1529 (1992) .......................................................................... 20

*United Bhd. of Carps. and Joiners of Am. v. Scott*,
  463 U.S. 825 (1983) ............................................................................ 20

*United States v. Alvarez*,
  567 U.S. 709 (2012) ............................................................................ 11

*United States v. Jaycees*,
  468 U.S. 609 (1984) ............................................................................ 18

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ............................................................................ 10

*Walker v. City of Lakewood*,
  272 F.3d 1114 (9th Cir 2011) ............................................................... 9

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ....................................................................... 15, 21

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ............................................................................ 11

*Ex Parte Young*,
  209 U.S. 123 (1908) ............................................................................ 24

**Statutes**

42 U.S.C § 1983 ............................................................................... 22, 23

42 U.S.C. § 1985 .............................................................................. 19, 20

Cal. Food & Agric. Code § 3965 ............................................................ 25

Cal. Food & Agric. Code § 3965.1 ......................................................... 25

TABLE OF AUTHORITIES

Cal. Penal Code § 26805 ........................................................................ 4

Cal. Penal Code § 27200 ........................................................................ 2

Cal. Penal Code § 27205 ........................................................................ 2

Cal. Penal Code § 27210 ........................................................................ 2

Cal. Penal Code § 27215 ........................................................................ 2

Cal. Penal Code § 27220 ........................................................................ 2

Cal. Penal Code § 27230 ........................................................................ 2

Cal. Penal Code § 27240 ........................................................................ 3

Cal. Penal Code § 27305 ........................................................................ 3

Cal. Penal Code § 27310 ........................................................................ 4

Cal. Penal Code § 27315 ........................................................................ 3

Cal. Penal Code § 27320 ........................................................................ 3

Cal. Penal Code § 27335 ........................................................................ 3

Cal. Penal Code § 27340 ........................................................................ 3

Cal. Penal Code § 27545 ........................................................................ 4

**Other Authorities**

27 C.F.R. § 478.100 ............................................................................... 4

Fed. R. Civ. P. 8 .................................................................................... 8

Fed. R. Civ. P. 12 ............................................................................... 1, 8

Fed. R. Civ. P. 56 .................................................................................. 9

U.S. Const. amend. I ...................................................................... *passim*

U.S. Const. amend. II ..................................................................... *passim*

U.S. Const. amend. XI ..................................................................... 23, 24

U.S. Const. amend. XIV .............................................................. 9, 18, 19

| | |
|---|---|
| 1 | **INTRODUCTION** |
| 2 | A gun show is a public gathering. There are no membership requirements, no |
| 3 | VIP sections, no special invitations. Anyone can attend, including children and |
| 4 | seniors. Thousands of these shows take place in towns throughout the United States, |
| 5 | in places ranging from flea markets to vacant commercial discount stores. Licensed |
| 6 | retailers display and sell firearm-related products, but vendors also sell historical |
| 7 | pieces, jewelry, home décor, and even homemade fudge and tattered romance novels. |
| 8 | Second Amendment supporters attend not only to purchase firearms, but also to |
| 9 | engage in speech about the lawful uses of firearms and preservation of their cherished |
| 10 | rights. A gun show is just another public gathering where people can freely assemble |
| 11 | and engage in lawful expressive activity. |
| 12 | The 22nd District Agricultural Association enacted a moratorium on these |
| 13 | events at the Del Mar Fairgrounds for at least a year. The District does not claim its |
| 14 | ban is necessary to stop a known, measurable, or serious problem. Indeed, it must |
| 15 | admit there is no evidence that gun shows pose some unique threat to public safety. |
| 16 | Nor have they identified any other compelling interest that might justify the |
| 17 | moratorium. Instead, the District's only justification is that it wishes to study the |
| 18 | public safety impacts of gun shows at the Venue. But that pretextual interest alone |
| 19 | proves the District lacked a legitimate public safety interest when it adopted the |
| 20 | moratorium. And the moratorium's history shows that it was really animus for |
| 21 | Plaintiffs and their intended speech that motivated the District to act. |
| 22 | Plaintiffs seek to enjoin the moratorium because it is an invalid prohibition on |
| 23 | First Amendment activity in a public forum, and because it violates their rights to |
| 24 | equal protection under the law. Plaintiffs request that this Court exercise its discretion |
| 25 | to treat the City's Rule 12(b)(6) motion and this opposition as cross-motions for |
| 26 | summary judgment. And, for the reasons discussed below, deny the City's motion to |
| 27 | dismiss, grant summary judgment in Plaintiffs' favor, declare the gun show |
| 28 | moratorium unconstitutional, and permanently enjoin its enforcement. |

# STATEMENT OF FACTS

## I.   STATE-LAW REGULATION OF GUN SHOWS IN CALIFORNIA

The state of California has the most rigorous regulatory regime for commerce in firearms and ammunition in the United States. That is, perhaps, most true for the sale of firearms and ammunition at gun shows. For laws related to the sale of firearms at gun shows are stricter than those governing sales at brick-and-mortar stores or over the internet. The following summarizes California gun-show law.

First, the state must approve and license all gun show "producers." Each event must have an individual "promoter" with a valid Certificate of Eligibility" from the California Department of Justice. Cal. Penal Code § 27200(a). Gun show producers must abide a long list of requirements. They must (1) certify their familiarity with applicable laws (*id.* § 27200), (2) maintain an insurance policy with at least $1,000,000 coverage (*id.*), (3) provide DOJ with an annual list of its events (*id.*), (4) notify DOJ no later than 30 days before a gun show of any changes to its annual list of events (*id.*), and (5) provide law enforcement with a complete list of all firearm retailer vendors that will participate in the show (*id.* § 27205).

In addition, promoters must submit an annual event and security plan to DOJ and to local law enforcement. *Id.* § 27210(a). The plan must identify the type of event, its location, date, and time, the estimated number of firearm retailer vendors and attendees, the number of entrances and exits, a contact for both the promoter and facility, the number of sworn peace officers who will be present, and the number of non-sworn security who will be present. *Id.* § 27210. They must also inform vendors of all applicable laws. *Id.* § 27215. That's not all. Promoters must provide a list of all vendors and licensed firearm dealers to DOJ at least seven days before the event to ensure each possesses a valid license and is eligible to participate. *Id.* § 27220. If a *vendor* is not approved, or violates applicable laws, the vendor cannot participate. *Id.* If a *promoter* fails to inform all prospective vendors of applicable laws or fails to submit a complete list of vendors, the event cannot take place. *Id.* § 27230.

At the event, promoters must post visible signs that include various warnings related to California gun-show laws. *Id.* § 27240(a). Promoters must also post signs at each entrance to the venue's parking lot, warning attendees that "[t]he transfer of firearms on the parking lot of this facility is a crime." *Id.* § 27240(b). The Gun Show Act of 2000 imposed even more restrictions on activities at gun shows in the state:

- Vendors cannot display, possess, or offer for sale any firearms, knives, or weapons for which possession or sale is prohibited (*Id.* § 27305(a));

- Vendors must acknowledge that they are responsible for knowing and complying with all applicable federal, state, and local laws dealing with the possession and transfer of firearms (*id.* § 27305(b));

- Vendors' conduct must not encourage hate crimes (*id.* § 27305(c));

- Vendors will process all transfers of firearms through licensed firearms dealers as required by state law (*id.* § 27305(d));

- Vendors will verify that all firearms in their possession will be unloaded and secured to prevent them from being operated except for brief periods when the firearm is being demonstrated to a potential buyer (*id.* § 27305(e));

- Vendors must provide all required information under Penal Code § 27320 (*id.* § 27305(f));

- Vendors must not display or possess black powder (*id.* § 27305(g));

- Vendors may only display ammunition only in closed, original factory boxes or other closed containers (*id.* § 27315);[1]

- No member of the public under 18 years old may enter a gun show unless accompanied by a parent or legal guardian (*id.* § 27335); and

- No person other than security personnel or law enforcement may possess both a firearm and ammunition for that firearm at the same time, except for vendors who are selling both (*id.* § 27340(a)).

Finally, no firearm transfers may take place at any gun show in California absent narrow exceptions applicable only to law enforcement. Vendors may begin the process onsite through a licensed "transfer dealer," but they cannot complete it there.

---

[1] This summer, additional restrictions on ammunition sales take effect and gun shows must comply.

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

Instead, purchasers must pick up their firearm after a 10-day waiting period and background check at a licensed firearm retailer at a different licensed location.[2] In short, there is no "loophole" at gun shows operated under California Law.

## II.   THE GUN SHOW EXPERIENCE

Gun show events are a modern bazaar—a convention of like-minded individuals who meet in a unique public forum set aside by the government for all manner of speech and commerce. Compl. ¶ 47. They include the exchange of products, ideas, knowledge, services, education, entertainment, and recreation, largely related to the lawful uses of firearms. *See also* 27 C.F.R. § 478.100(b). Like-minded people come together to explore the lawful uses of firearms, including self-defense, hunting, target shooting, safety training, gunsmithing, and appreciation of firearms. Compl. ¶¶ 47-50, 52-54; Bardack Decl. ¶ 5; Diaz Decl. ¶ 5; Dupree Decl. ¶ 5; Irick Decl. ¶ 5; Walsh Decl. ¶ 5; Olcott Decl. ¶ 4; Sivers Decl. ¶ 9; Travis Decl. ¶¶ 9; Gottlieb Decl. ¶ 4. At guns shows, organizations share information, speakers give lectures, trainers hold classes, and participants discuss gun rights. Compl. ¶¶ 47-50, 52-54; Bardack Decl. ¶ 6; Dupree Decl. ¶ 6; Irick Decl. ¶ 6; Olcott Decl. ¶ 5; Sivers Decl. ¶ 7; Travis Decl. ¶ 10; Gottlieb Decl. ¶ 4. What's more, candidates for office often attend to discuss politics, government, and law with their constituents. Compl. ¶ 52; Olcott Decl. ¶ 6. This forum is vital in California where government actors at all levels are openly hostile to the Second Amendment and the values of its supporters.

In short, gun shows are a celebration of America's "gun culture," an essential outgrowth of the rights that flow from the Second Amendment. Compl. ¶ 49. Participating in that culture is one of the primary reasons people attend gun shows, even if they are not in the market to sell or buy a firearm. *Id.*; Bardack Decl. ¶ 7; Diaz

---

[2] Cal. Penal Code § 27310 (requiring all firearm transfers at gun shows to comply with state and federal law); *id.* § 26805 (prohibiting the sale and transfer of a firearm by a licensed dealer at any location other than the dealer's licensed premises but allowing dealer to prepare documents at a gun show in preparation for completion of the sale); *id.* § 27545 (requiring all transactions to be processed through a licensed dealer when neither party is a licensed firearm dealer).

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

Decl. ¶ 7; Dupree Decl. ¶ 7; Irick Decl. ¶ 7; Olcott Decl. ¶ 11; Sivers Decl. ¶ 10; Travis Decl. ¶ 11; Gottlieb Decl. ¶ 6; Redmon Decl. ¶ 10.

While the cultural experience is no doubt the most important aspect of gun shows, that is not to say that sales of firearms, ammunition, and accessories are not also important. Many attend gun-show events to learn about available products when considering whether to buy firearms and to exchange knowledge with experienced firearm retailers that they cannot access elsewhere. Dupree Decl. ¶ 5; Irick Decl. ¶ 5; Walsh Decl. ¶ 6; Olcott Decl. ¶ 12; Redmon Decl. ¶ 5. Gun shows are simply not just another avenue for commerce in firearms.

## II. THE DEL MAR FAIRGROUNDS

The state of California owns the Del Mar Fairgrounds ("the Venue"). Compl. ¶ 58, Ex. 1. The state vests authority to manage the Venue with the Board of Directors of the 22nd District Agricultural Association ("the District"). *Id.* ¶ 58. Defendant Karen Ross, the Secretary of the Department of Food & Agriculture, oversees the operation of California's agricultural districts. *Id.* ¶ 59. The Department of Food & Agriculture, under Secretary Ross, provides policies for operating all agricultural districts in the state, including the use of fairground facilities. *Id.*; Okita Decl., Ex. 1.

Because of its size and location, the Venue is a unique facility—there being no other comparable public or private venue of in the area. Compl. ¶ 61; Olcott Decl. ¶ 6. Many public groups thus use the Venue to host large, expressive events, including concerts, festivals, expos, and trade shows. Compl. ¶ 63, Ex. 2 at 45-76; Barvir Decl., Ex. 2 ("Meetings, conventions, conferences, trade or consumer shows, music festivals, weddings, bar or bat mitzvahs, reunions or social events—when people gather, the Del Mar Fairgrounds is the perfect location!"), Ex. 3. The District actively promotes use by the public. Compl. ¶ 64; Barvir Decl., Exs. 2-3. Indeed, its mission is "[t]o manage and promote a world-class, multi-use, public assembly facility with an emphasis on agriculture, education, entertainment, and recreation . . . for the benefit of all." Compl. ¶ 66; Barvir Decl., Ex. 3. Under the Department of Food &

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

Agriculture's policy, however, whether to rent fairground "facilities for gun shows is a policy decision to be made by the fair board and their community." Compl. ¶ 60; Okita Decl., Ex. 1 at 69. The recent decision of the District to stop renting the Venue for only that purpose is the issue here.

## III. THE CROSSROADS GUN SHOW

Plaintiff B & L Productions, Inc., d/b/a Crossroads of the West ("Crossroads") has operated popular, safe, heavily regulated, legal and family-friendly gun show events as a business in California for over 30 years. Compl. ¶¶ 1-2, 13; Olcott Decl. ¶ 2. It produces events at the Venue where like-minded people gather to engage in lawful speech and commerce necessary for the exercise of Second Amendment rights. Compl. ¶¶ 2-3; Olcott Decl. ¶ 7.

Vendors at Crossroads gun shows are often the same licensed vendors that have brick-and-mortar stores in the community, operate legally over the internet, and are registered with the state as lawful businesses. Compl. ¶ 51; Olcott Decl. ¶ 13; Redmon Decl. ¶ 6. They sell legal products and enjoy attending gun shows so they can interact with customers in a more meaningful way. Compl. ¶ 51; Olcott Decl. ¶ 11; Redmon Decl. ¶ 5. To the degree that gun shows involve commerce in arms, Crossroads gun shows promote public safety because they provide a convenient and transparent venue for the lawful transfer of firearms which disincentivizes the importation of firearms from neighboring states. Olcott Decl. ¶ 14.

## III. DEFENDANTS BAN GUN SHOW EVENTS AT THE VENUE

For the past 30 years, Crossroads has, in accordance with the District's procedures, secured its upcoming event dates through a "hold" system that acts as a right of first refusal for returning event promoters. Compl. ¶¶ 68-74; Olcott Decl. ¶ 15. In fact, in July 2018, the District had already confirmed "holds" on Crossroads' preferred dates for gun shows at the Venue throughout 2019. Compl. ¶ 75-77, Ex. 4; Olcott Decl. ¶ 15. But even though Crossroads had secured its 2019 "hold" dates, and despite the long and safe history that Crossroads has with the Venue, the political

environment has become hostile toward gun show events and, more generally toward the "gun culture." Compl. ¶ 78.

Today, gun-show-banning activists are at work throughout the country to ban *all* gun shows *everywhere*, not because they are "dangerous for the community," but because these activists do not subscribe to the same values as gun show promoters, vendors, and participants. *Id.* ¶ 79; Barvir Decl., Exs. 7, 13, 21-22. In recent years, gun-show-banning activists have pressured the District to prohibit gun show events at the Venue. Compl. ¶ 80; Barvir Decl., Exs. 7, 13. These activists rely on unfounded fears about the security of gun shows, false claims that these events are inherently dangerous because they normalize "gun culture," and stereotypes about the people who attend these events. Compl. ¶ 81; Barvir Decl., Exs. 7, 13, 21-22 .

In response, the District began a series of meetings and comment periods to determine whether it should continue to contract with Crossroads for the use of the Venue for gun shows. Compl. ¶ 82; *see* Barvir Decl., Exs. 12, 16-18. The District engaged in communications with other government agencies and with Crossroads to determine whether gun shows at the Venue were in full compliance with applicable laws. Compl. ¶ 83. Defendant Shewmaker appointed a non-public, ad hoc committee of two members of the District (himself and Defendant Valdez) to investigate gun shows at the Venue and provide recommendations for the continued use of the Venue for gun show events. Compl. ¶ 84; Barvir Decl., Ex. 18 at 159-62; Cheuvront Decl. ¶ 9. And communications between Shewmaker and Lt. Governor Newsom revealed Shewmaker's motivation to "take action and do something on September 11th" to end gun shows at the Venue. Compl. ¶¶ 85-86; Barvir Decl., Exs. 10-11.

At a public hearing Shewmaker and Valdez recommended that the District "not consider any contracts with the producers of gun shows beyond December 31st 2018 until such time as the District has put into place a more thorough policy" for operating gun shows at the Venue. Compl. ¶ 88, Ex. 7; Barvir Decl., Ex. 9, Ex. 18 at 19-23. After hearing Shewmaker's comments that he was done "drinking the Kool-

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

Aid" and his story about gun violence unrelated to gun shows, the District adopted the proposed one-year moratorium and canceled Crossroads' reserved 2019 dates. Barvir Decl., Ex. 18 at 159, 162; Cheuvront Decl. ¶ 15.

Defendants claim the moratorium is necessary to conduct a study of public safety issues related to Crossroads gun shows. Barvir Decl., Exs. 8-9, Ex. 18 at 15; Defs.' Mem. Supp. Mot. Dismiss ("Mot.") 1, 12, 15, 18. For the lengthy process of meetings, public comment, and communications with stakeholders did not result in *any* finding that allowing the (already heavily regulated) gun show events to continue at the Venue posed any risk to public safety. Compl. ¶ 92; Barvir Decl., Ex. 18 at 12, Ex. 20. And the ad hoc committee presented no evidence of any safety concerns that could be linked to the 30-year-old gun-show event. Barvir Decl., Exs. 8-9, Ex. 18.

## LEGAL STANDARDS

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). That is, plaintiff need provide just a short and plain statement showing that he is entitled to relief. Fed. R. Civ. P. 8(a)(2). At this stage, courts must view the complaint "in the light most favorable to the plaintiff, taking all allegations as true, and drawing all reasonable inferences from the complaint in [plaintiffs'] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005).

Generally, courts do not consider matters outside the pleadings on a Rule 12(b)(6) motion to dismiss. But it is within the Court's discretion to consider outside evidence, treating the motion to dismiss as a motion for summary judgment. Fed. R. Civ. P. 12(d). The Court should exercise that discretion here. For this case largely (if not entirely) involves questions of law the Court can resolve without a robust record. Because the District readily admits that the very purpose of the moratorium is to study the public safety effects of gun shows at the Venue, Mot. 1, 12, 15, 18, the District must concede that it has no real public safety interest in the moratorium. And

8

once that is conceded, no relevant factual dispute remains.

Summary judgment is proper when the record shows there is "no genuine dispute as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* Here, there is no genuine dispute of fact and Plaintiffs are entitled to judgment as a matter of law.

## ARGUMENT

## I.   THE MORATORIUM VIOLATES PLAINTIFFS' RIGHT TO FREE SPEECH[3]

The First Amendment embodies a national commitment to "robust political debate[,]" *Hustler Magazine v. Falwell*, 485 U.S. 46, 51 (1988), providing, in part, that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. The First Amendment right to free speech has been incorporated and thus applies to state and local governments by the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666 (1925). The Supreme Court has established a three-pronged analysis to determine whether a government speech restriction violates the First Amendment. First, the Court must decide whether the First Amendment protects the restricted speech. *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If it does, the court must then "identify the nature of the forum [in which one seeks to engage in expressive activity], because the extent to which the [g]overnment may limit access depends on whether the forum is public or nonpublic." *Id.* And, finally, the court must "assess

---

[3] The District claims that Second Amendment Foundation ("SAF") lacks standing "entirely" because it has not alleged a drain on its resources or harm to its mission. Mot. 7 n.3. But SAF need only allege an actual injury independent of this suit. *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir 2011). SAF has alleged such injury—the suppression of its own First Amendment rights. Nothing more is required. But, if the Court would like more, SAF can simply amend.

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

1  whether the [government's] justifications for exclusion from the relevant forum
2  satisfy the requisite standard." *Id.*

3      Under this analysis, the District's moratorium infringes on Plaintiffs' right to
4  free speech. For Plaintiffs seek to engage in all manner of protected expression
5  related to the lawful use of firearms—as they have done at the Venue for over 30
6  years. *See* Olcott Decl. ¶¶ 2, 7, 8, 9, 10, 11, 17. The District has, for at least the time
7  being, banned Plaintiffs' intended speech and expressive conduct at the Venue, a
8  "public assembly facility" managed by the District "for the benefit of all." Barvir
9  Decl., Ex. 3. And, worse yet, it has done so based on the content and viewpoint of
10  Plaintiffs' message. For these reasons, the Court should apply strict scrutiny and
11  swiftly strike the District's moratorium. But no matter what level of scrutiny applies,
12  the result is the same—the District cannot "prov[e] the constitutionality of its
13  actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

14      **A.**    **Plaintiffs Seek to Engage in First Amendment Protected Expression**

15      Gun shows, including those Crossroads has held at the Venue for over 30
16  years, bring together like-minded people to engage in all manner of protected speech.
17  Attendees at the Crossroads gun show explore the lawful uses of firearms, including
18  self-defense, hunting, target shooting, safety training, gunsmithing, and appreciation
19  of firearms. Bardack Decl. ¶ 5; Diaz Decl. ¶ 5; Dupree Decl. ¶ 5; Irick Decl. ¶ 5;
20  Walsh Decl. ¶ 5; Olcott Decl. ¶ 7; Travis Decl. ¶¶ 3, 9; Gottlieb Decl. ¶ 4. Second
21  Amendment groups share information, speakers give lectures, trainers hold classes,
22  and participants engage others, including candidates for public office, in discussions
23  about gun rights. Bardack Decl. ¶ 6; Dupree Decl. ¶ 6; Irick Decl. ¶ 6; Olcott Decl. ¶
24  9; Redmon Decl. ¶ 7; Sivers Decl. ¶ 12; Travis Decl. ¶ 10; Gottlieb Decl. ¶ 4. And, of
25  course, retailers offer firearms and related goods for sale. Olcott Decl. ¶ 11; Walsh
26  Decl. ¶ 6; Redmon Decl. ¶ 5.

27      The First Amendment no doubt protects Plaintiffs' intended expression. It is
28  not obscene, defamatory, or fraudulent. It does not advocate for imminent lawless

action or solicit others to commit crimes. Nor does it constitute fighting words or true threats. No, Plaintiffs' intended expression is not among those unprotected classes of speech. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). To the contrary, it involves lawful speech that ranges from purely political to commercial—and it all pertains to the exercise and preservation of the right to keep and bear arms. What's more, "[t]he sale of merchandise inextricably intertwined with a religious, political, ideological, or philosophical message is fully protected by the First Amendment." *Hunt v. City of Los Angeles*, 601 F. Supp. 2d 1158 (C.D. Cal. 2009), *aff'd on appeal at* 638 F.3d 703 (9th Cir. 2011). Because the moratorium targets protected speech, the Court should next determine whether the Venue is a public or nonpublic forum.

### B.    The Del Mar Fairgrounds Is a Public Forum

There are "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*, 473 U.S. at 802 (1985) (citing *Perry Educ. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45 (1983)). The most accessible of these is the "traditional public forum." In such spaces, any content-based prohibition on expressive conduct must survive strict scrutiny, meaning that it must be "necessary [and narrowly drawn] to serve a compelling state interest." *Perry*, 460 U.S. at 45. "[Q]uintessential public forums" include streets and parks, which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.*

"Designated public forums" include areas that are not *quintessentially* public forums, but which the state has "opened for use by the public as a place for expressive activity." *Id.* at 45. In these forums, the government "is bound by the same standards as apply in a traditional public forum." *Id.* at 46. That is, content-based restrictions on speech are subject to strict scrutiny. Examples of these forums include university facilities subject to an established reservation policy, *Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981), and school board meetings where the board retains

"broad authority to structure the discussion," *City of Madison v. Wis. Employment Rels. Comm'n*, 429 U.S. 167, 177-79 (1976).

Here, the Venue is, at least, a designated public forum. The Venue is state-owned property maintained for public use. Compl. ¶ 58, Ex. 1. It hosts all manner of expressive events, including concerts and trade shows. Compl. ¶ 63, Ex. 2 at 45-76; Barvir Decl., Exs. 2-3. Because the state holds it open to the public for these uses, the Venue is a "public forum." *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 569 (9th Cir. 1984) (quoting *Perry*, 460 U.S. at 45-46). As the Venue's own mission statement confirms, the Venue is a "world-class, multi-use, public assembly facility with an emphasis on agriculture, education, entertainment, and recreation" maintained "for the benefit of all." Compl. ¶ 66; Barvir Decl., Ex. 3. The state has chosen to open the Venue to public assembly and expression. So it is, at least, a designated public forum and the moratorium must survive the most exacting scrutiny.

## C.    The Moratorium Is a Content-based Speech Restriction

"[A]bove all else, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972); *see also Ashcroft v. Am. Civil Libs. Union*, 535 U.S. 564, 573 (2002). The Constitution thus "demands that content-based restrictions on speech be presumed invalid . . and that the Government bear the burden of showing their constitutionality." *Ashcroft v. Am. Civil Libs. Union*, 542 U.S. 656, 660 (2004). Such restrictions are especially disfavored. *Reed v. Town of Gilbert*, __ U.S. __, 135 S. Ct. 2218, 2226 (2015) (holding that content-based speech restrictions are presumptively unconstitutional and subject to strict scrutiny). Indeed, holding that a government restriction on speech is content-based is often determinative. *See, e.g.*, *Ark. Writers' Project v. Ragland*, 481 U.S. 221, 231-32 (1987); *Carey v. Brown*, 447 U.S. 455, 464-69 (1980).

Government restrictions that selectively ban speech based on its subject matter are content-based regulations. *See Mosley*, 408 U.S. at 45. They regulate speech "by

12

particular subject matter" or "by its function or purpose." *Reed*, 135 S. Ct. at 2227. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.' " *Id.* at 2230 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Here, the challenged moratorium is a content-based restriction. Ninth Circuit precedent protects the buying, selling, and display of firearms at gun shows on public property. *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707 (9th Cir. 1997). *Nordyke v. King*, 681 F.3d 1041, 1044-45 (9th Cir. 2012) (en banc). Thus, the only activities in the gun-show bundle that remain are the purely expressive ones associated with the Second Amendment advocacy. By singling out and prohibiting Plaintiffs' expressive activities through its gun-show moratorium, the District has engaged in content-based restriction of speech. The District has not closed the Venue to all events to conduct a comprehensive study of security and public safety at the Venue. Instead, it singled out Plaintiffs' gun shows because of their content.

Indeed, the District is treating gun shows differently from car shows, home shows, and beer and wine shows, despite data attesting to the public safety risks incident to them. Automobile accidents killed more than 500 youth between 15 and 24 on California's highways in 2017 alone. Req. Jud. Ntc., Ex. 26 at 4-5. That same year, 63 children drowned in pools and spas. *Id.* at 3, 5. And abuse of alcohol, regularly sold and imbibed at the Venue, poses a well-known threat to public health and safety. *See id.* at 5. Yet less than 1% of criminals admit to obtaining firearms at gun shows, and less than 2% of gun transactions take place at gun shows. *Id.*, Ex. 24 at 1, Ex. 25 at 5. This strongly suggests the moratorium is about animus for "gun culture" and not a genuine concern for public safety.[4] Ultimately, the District's

_____

[4]   The District never moved to halt music events at the Venue even though a man opened fire on a crowd at the Venue when he was denied entrance to an Ice Cube concert in fall 2018. Barvir Decl., Ex. 18 at 6-10. To the contrary, Shewmaker

1  choice to permit virtually all events *except* gun shows is a corner the District cannot

2  walk itself out from.

3       Worse yet, the District targeted gun shows *because* of who Plaintiffs are and

4  what they represent—the "gun culture." Barvir Decl., Ex. 7, Exs. 10-11, Ex. 18 at 44,

5  69, 161, Exs. 21-22. By singling out the "gun culture" for banishment from the

6  Venue, based on the viewpoint of the expressive activities that take place at gun

7  shows, the District engaged in viewpoint-based discrimination, a most "egregious

8  form of content discrimination." *Reed*, 135 S. Ct. at 2230. So the moratorium can

9  only stand if it satisfies the most exacting judicial review. *Reed*, 135 S. Ct. at 2226.[5]

10       **D.   The District's Moratorium Cannot Survive Heightened Scrutiny**

11       Because the moratorium is a content-based restriction (and prior restraint) on

12  protected speech in a public forum, strict scrutiny applies. But even if the Court

13  applies the more-forgiving intermediate scrutiny, the moratorium cannot stand.

14       Under either form of heightened scrutiny applied to laws burdening protected

15  speech, a challenged law is *presumed* unconstitutional, and the government bears the

16  burden of justifying it. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)

17  (content-based speech regulations are presumptively invalid). To justify a burden on

18  a constitutionally protected right, the government must prove that it is appropriately

19  tailored to advance a sufficiently important end. Under strict scrutiny, this requires

20  _____

21  cited the incident as evidence supporting his push to increase security at *gun shows*.
   Phil Diehl, *Fair Board to Consider Ban on Gun Shows at Del Mar Fairgrounds*, L.A.

22  Times (Sept. 8, 2018), *available at* https://www.latimes.com/local/lanow/la-me-ln-
   delmar-gun-shows-20180908-story.html (last visited Apr. 17, 2019).

23       [5] What's more, when a government refuses to allow some groups to use a

24  designated public forum based on disapproval of the content of the message, courts
   often consider the government's actions a "prior restraint" on free speech. *Se.*

25  *Promos., Ltd. v. Conrad*, 420 U.S. 546 (1975). "Prior restraints" naturally abridge the
   freedom of speech and are thus particularly suspect. Indeed, "[a]ny system of prior

26  restraints of expression . . . bear[s] a heavy presumption against its constitutional
   validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Only in the face of

27  an acute government interest, and only when the limitation is no broader than
   necessary to achieve that interest, should the Court uphold a prior restraint on speech.

28  *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 203 (1981).

the government to prove "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S. Ct. at 2231. Under intermediate scrutiny, the government must prove it is "narrowly tailored to serve a significant government interest." *Madsen v. Women's Health Ctr. Inc.*, 512 U.S. 753, 764 (1994). The means employed " 'need not be the least restrictive or least intrusive means' of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). But it should be "closely drawn" to avoid "unnecessary abridgment" of protected conduct. *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)). Here, the total ban on gun show events at the Venue while the District studies some imagined public safety concern is not "closely drawn" to any legitimate government interest. It is unconstitutional.

First, the District has no sufficient interest in maintaining the moratorium. A "compelling government interest" is an *actual interest* in addressing an *actual problem*. *See Grutter v. Bollinger*, 539 U.S. 306, 331-336 (2003). The District claims that its moratorium is necessary so that it may study the public safety impacts of gun shows at the Venue and, if necessary, adopt even more restrictions (including a permanent ban) on such events. Compl. ¶ 94; Barvir Decl., Exs. 8-9, Ex. 18 at 15. While the government generally has a compelling interest in public safety, that interest is just a pretext here—a ruse to cover up the District's animus for "gun culture" and those who participate in it.

Before enacting the moratorium, Shewmaker formed a two-person ad hoc committee to "investigate" whether gun shows present unique safety concerns and whether gun shows at the Venue are safe. Compl. ¶¶ 25, 84; Barvir Decl., Ex. 18 at 159-62, Cheuvront Decl. ¶ 9. Even after the investigation, the committee presented no evidence that gun shows present a public safety concern. Compl. ¶ 95; *see* Barvir Decl., Exs. 8-9. The Venue's head of security has expressed confidence in the security of events at the Venue. Compl. ¶ 91; Barvir Decl., Ex. 18 at 127-131, Ex. 20

15

at 4. And neither state nor local law enforcement have complained about Plaintiffs' gun shows. *Id.*, Ex. 5, Ex. 20 at 1-3. What's more, in its over 30 years at the Venue, there have been only minor incidents at the Crossroads gun show, not unlike incidents at other events like the quilt show. Compl. ¶¶ 1, 13; Barvir Decl., Ex. 18 at 130, Ex. 20 at 7; Cheuvront Decl. ¶ 13. The very passage of the moratorium—to study the public safety impact of gun shows—is itself proof that the District cannot show that gun shows present an "actual problem" for public safety.

Instead, the District's "actual interest" was a politically motivated, animus-driven one. This is perhaps best evidenced by Newsom's letter encouraging Defendants to ban gun shows. He wrote: "Permitting the sale of firearms and ammunition on state-owned property only perpetuates America's gun culture at a time when 73% of Californians support gun reform measures and 73% of California [sic] cite concern about the threat of mass shootings in our schools." Compl. ¶ 85; Barvir Decl., Ex. 10. Shewmaker's response to Newsom, boasting that he intended "do something" to end the shows at the Venue, Compl. ¶ 86; Barvir Decl., Ex. 11, and his public comment that he was "done drinking the Kool-Aid," Compl. ¶ 90; Barvir Decl., Ex. 18 at 159, 162; Cheuvront Decl. ¶ 13, further evidence the District's true motivations. Ultimately, its "actual interest" was simply in banning gun shows—and the expressive activities that take place at them. This is not a legitimate public interest, let alone a compelling or significant one.

But even if the District could point to some sufficient interest in public safety, it cannot prove that the moratorium is sufficiently tailored to that end. To meet the requirement of narrow tailoring, the government must target the exact wrong it seeks to remedy, and no more. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy."). In analyzing public safety regulations designed to mitigate concrete public safety concerns, *a ban is necessarily overbroad. Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 863 (9th Cir. 2001). The ban at issue is particularly so.

For Crossroads has operated safe and legal gun shows at the Venue for decades. Compl. ¶ 13; Olcott Decl. ¶¶ 2-3. The events are largely incident-free and there is no evidence that they create a unique risk to public safety. Compl. ¶¶ 90-95; Barvir Decl., Ex. 5, Exs. 8-9, Ex. 18 at 127-131, Ex. 20 at 1-4. The District can give no reason, except for one steeped in animus, that the Crossroads show could not continue to take place *while* the District conducted its safety study.[6] Nor can it explain why it could not have simply adopted additional security measures short of shutting down all gun shows and the expression that takes place at them. *Truly, there is no reason the District had to stray from the 30-plus-year status quo.*

Similar acts have been invalidated for the same reason this moratorium should be. For example, the Ninth Circuit held that 6a county's ban on the firearm sales on county land was overbroad for it abridged commercial speech associated with the sale of legal products. *Nordyke*, 110 F.3d 707. In a similar case, the Ninth Circuit held that, if interpreted so as to ban the display of firearms at gun shows at a county fairground, an ordinance banning the possession of firearms on county property was invalid. *Nordyke v. King*, 681 F.3d at 1044-45. Just as the government could not justify its gun show restrictions in those cases, nor can the District here. Because it cannot meet its burden under any level of heightened scrutiny, the moratorium unconstitutionally restricts Plaintiffs' First Amendment rights and must be enjoined.

## II.   THE MORATORIUM VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHT OF ASSEMBLY

The First Amendment protects not only the right of free speech, but also "the right of the people peaceably to assemble." U.S. Const., amend. I. The right to assemble often merges with the right to free expression. For "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as th[e Supreme] Court has more than once

---

[6] In fact, the District did allow two more shows to take place in late 2018 *after* the District adopted the moratorium. Cheuvront Decl. ¶ 15.

recognized." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1959); *see also Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987); *United States v. Jaycees*, 468 U.S. 609 (1984); *DeJonge v. Oregon*, 299 U.S. 353 (1937). "Governmental action which may have the effect of curtailing the freedom to associate is subject to the *closest* scrutiny." *NAACP*, 357 U.S. at 461-62 (emphasis added).

The moratorium restricts Plaintiffs' fundamental right to assemble with like-minded people to engage in expressive activities, including speech related to "gun culture," the lawful use of firearms, and preservation of the Second Amendment. The District's interest in restricting Plaintiffs' rights is not compelling or significant. *See* Argument, Part I.D. It is not narrowly tailored, and it is not the least restrictive means. *Id.* Thus, the moratorium cannot survive heightened judicial scrutiny.

## III.   THE MORATORIUM VIOLATES PLAINTIFFS' RIGHT TO EQUAL PROTECTION

The District singling out Plaintiffs because of the content of their speech also violates their fundamental rights under the Equal Protection Clause. U.S. Const. amend. XIV. The Supreme Court, long ago, recognized that *both* the Equal Protection Clause *and* the First Amendment forbid the government from granting "the use of a forum to people whose views it finds acceptable, but deny[ing] use to those wishing to express less favored or more controversial views." *Mosley*, 408 U.S. at 96. Indeed, the Court held, the government "may not select which issues are worth discussing or debating in public facilities." *Id. "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.*" *Id.* (emphasis added). If unequal treatment occurs in the context of exercising a fundamental right, or the government is motivated by animus toward a disfavored group, courts apply heighted scrutiny. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967).

Here, the District's moratorium, targeting only members of the "gun culture" who attend Crossroads gun shows, is undeniably infused with Defendants' desire to

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

harm this politically unpopular group. And it was passed at the direction of the politically popular (and powerful) governor of California. Compl. ¶ 85; Barvir Decl., Ex. 10. Once again, the District cannot justify its moratorium under either strict or intermediate scrutiny for purposes of the First Amendment, and it cannot justify it under the Equal Protection Clause either. Because the moratorium is not narrowly tailored to serve some compelling government interest, it unconstitutionally denies Plaintiffs equal protection under the law. It is invalid and must be enjoined.

## IV.   DEFENDANTS CONSPIRED TO VIOLATE PLAINTIFFS' CIVIL RIGHTS

Plaintiffs finally allege a section 1985 cause of action against Defendants Shewmaker and Valdez who, together with Governor Newsom and unidentified third parties, conspired to violate Plaintiffs' rights under the First and Fourteenth Amendments. To state a 1985 conspiracy claim, Plaintiffs must prove that Defendants (1) conspired (2) to deprive Plaintiffs of their rights under the law based on animus for the class to which Plaintiffs belong; (3) engaged in an act to further the conspiracy; and (4) deprived Plaintiffs of any civil right. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1973).

There is no material dispute over Plaintiffs' ability to prove the first, third, and fourth elements. At least two people—Shewmaker and Valdez—conspired together in closed meetings to end gun shows, and the speech and assembly that take place at those events, at the Venue. To advance their conspiracy, they presented a proposal to do just that at the September 11, 2018 meeting of the District. Compl. ¶¶ 88-89; Barvir Decl., Exs. 8-9, Ex. 18 at 159-62; Cheuvront Decl. ¶ 10. And with no evidence that gun shows generally (or Crossroads specifically) pose any threat to public safety, they urged the District to halt gun shows at the Venue for at least a year. Compl. ¶¶ 91-95; Barvir Decl., Exs. 8-9, Ex. 18 at 127-131, 159-62, Ex. 20 at 1-4; Cheuvront Decl. ¶ 14. As discussed in Parts I-III above, this act deprived Plaintiffs of their rights of free expression, association, and equal protection.

Defendants complain that, because Plaintiffs are not members of a "protected

19

class" for section 1985 purposes, their claim must fail. Mot. 24-25. To be sure, the

Supreme Court has expressed some reticence to apply section 1985 beyond African

Americans. *See United Bhd. of Carps. and Joiners of Am. v. Scott*, 463 U.S. 825, 836

(1983). But it did not categorically preclude the recognition of new classes. *Id.* at 838

(holding only that section 1985 does not "reach conspiracies motivated by economic

or commercial animus"). And the Ninth Circuit has acknowledged that courts

struggle to determine when section 1985 applies outside the context of race, having

"produced opinions that are all over the map." *Sever v. Alaska Pulp Corp.*, 978 F.2d

1529, 1536 (1992) (citing *Canalis v. San Joaquin Sheriff's Posse Comitatus*, 641

F.2d 711, 719 n. 15 (9th Cir. 1981)). But ultimately, this circuit applies section 1985

in contexts beyond race "only when the class in question can show that there has

been a governmental determination that its members 'require and warrant special

federal assistance in protecting their civil rights.' " *Id.* (quoting *Schultz v. Sundberg*,

759 F.2d 714, 718 (9th Cir. 1985)).

The broad diversity of authority on the issue, together with the Ninth Circuit's

rule applying section 1985 to non-race-based claims, supports a finding that Plaintiffs

are part of a class that can sustain a 1985 conspiracy claim. "Courts construing

1985(3) have not limited its protection to racial or otherwise suspect classifications."

*Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 505 (9th Cir. 1979). The *Reichardt*

court, for instance, held that a range of situations can satisfy the class requirement,

including political opponents, supporters of a political candidate, and even a single

family. *Id.* Plaintiffs are vocal supporters of the fundamental, individual right to keep

and bear arms protected by the Second Amendment. They claim that Defendants,

acting with invidious animus toward them as members of the "gun culture," violated

their First Amendment rights to speak and associate in manifestation of that support.

This bears no difference from the First Amendment speech in support of a political

candidate discussed in *Reichardt*.

For these reasons, Plaintiffs have stated a viable section 1985 conspiracy claim

1  against Shewmaker and Valdez. The Court should deny the District's motion.

2  **V.    DEFENDANTS' AFFIRMATIVE DEFENSES ARE UNAVAILING**

3          **A.    Shewmaker and Valdez Cannot Claim Legislative Immunity**
4                  **Because Their Actionable Conduct Was Not Legislative Activity**

5          Defendants Shewmaker and Valdez claim that absolute legislative immunity

6  bars Plaintiffs' claims against them. Mot. 8-10. When considering whether absolute

7  legislative immunity applies, courts generally consider whether the act: (1) "involves

8  ad hoc decisionmaking, or the formulation of policy"; (2) "applies to a few

9  individuals, or to the public at large"; (3) is "formally legislative"; and (4) "bears all

10 the hallmarks of traditional legislation." *Kaahumanu v. County of Maui*, 315 F.3d

11 1215, 1220 (9th Cir. 2003). Here, contrary to Defendants' cursory analysis of the

12 four-factor test, *none* of the factors weigh in their favor.

13         As for the first two factors, court generally consider actions based on

14 circumstances unique to particular people or groups that do not create broad public

15 policy to be ad hoc, *not* legislative. *See id.*, *accord San Pedro Hotel Co., Inc., v. City*

16 *of Los Angeles*, 159 F.3d 470, 476 (9th Cir 1998). Similarly, if an act affects only a

17 single parcel of land, courts find that fact weighs against application of legislative

18 immunity. *Kaahumanu*, 315 F.3d at 1220.

19         Defendants' claim that the moratorium was not the product of "an ad hoc

20 decision about a specific event promoter" notwithstanding, the moratorium affects

21 *only* Crossroads gun shows at the Venue. The District's "Gun Show Policy Report"

22 treats Crossroads and gun shows as interchangeable. Barvir Decl., Ex. 19. Crossroads

23 has long been the only promoter of gun shows at the Venue. *Id.*, Ex. 18. Crossroads

24 was the *only* promoter mentioned during any of the discussions about the

25 moratorium. *See id.*, Exs. 12, 16-18; Cheuvront Decl. ¶ 17. And the District cannot

26 dispute that the moratorium affects only events at the Del Mar Fairgrounds. Barvir

27 Decl., Ex. 9. So what may at first glance look like a broad legislative policy impacts

28 just one promoter at just one facility. This makes Defendants' conduct more ad hoc

than legislative, weighing *against* immunity.

As for the third and fourth factors, Defendants claim that their actions were "legislative" just because they involved a formal vote. Mot. 9. But Plaintiffs' claim is not simply that Shewmaker and Valdez are liable for their vote to strip Plaintiffs of their rights, but for their participation in the two-person ad hoc "contracts-committee" and their recommendation that the District adopt a moratorium on gun shows at the Venue. Compl. ¶¶ 25-26, 84-86, 88-90, 180. Nothing about that conduct was "formally legislative." The committee conducted its business in secret, with no public transparency or accountability. It could take no votes. And as a two-member committee not bound by the Open Meeting Act, it could not exercise any of the District's authority. Barvir Decl., Ex. 23 at 6. The committee was merely advisory.

But even if Plaintiffs based their claims against Shewmaker and Valdez on the District's "vote," that fact merely "weighs in favor of legislative immunity, *it does not in itself decide the issue*." *Kaahumanu*, 315 F.3d at 1223 (emphasis added). Instead, courts must assess the "character and effect" of the act to determine whether it was sufficiently legislative. *Cinevision*, 745 F.2d at 580. Here, those circumstantial characteristics are significant, and they prove that Defendants' conduct bore *none* of the "hallmarks of traditional legislation." *Kaahumanu*, 315 F.3d at 1220. *See also* Cheuvront Decl. ¶¶ 10-11, 15 (detailing the very informal nature of the District's deliberation and vote on the gun show moratorium).

In sum, the claim that absolute legislative immunity bars Plaintiffs' claims is hardly as clear cut as Defendants suggest. Far from being the product of deliberate legislative action aimed at adopting a broad public policy, the challenged moratorium was an ad-hoc decision adopted in a meeting that eschewed legislative formalities. Legislative immunity simply does not apply to such an act.

## B.   Plaintiffs Are Entitled to Damages Under 42 U.S.C § 1983

Section 1983 authorizes damages claims against individual defendants who, under color of law, deprive any citizen of their rights. 42 U.S.C. § 1983. Defendants

claim that because officials sued in their official capacity are not "persons" for purposes of section 1983, Plaintiffs' claims for damages against Shewmaker, Valdez, and Ross must fail. Mot. 10. First, as a matter of clarification, Plaintiffs have pleaded no damages claim against Ross—under section 1983 or any other section. They ask for "[a]n order of damages according to proof," Compl. 40, ¶ 11, but not from her or from the state agency she runs. Plaintiffs sue her in her official capacity as a state actor only and no claim for damages could stand.

As for Shewmaker and Valdez, however, they cannot escape liability under section 1983 just because they are sued in their official capacity. "Claims under § 1983 are limited by the scope of the Eleventh Amendment." *Doe v. Lawrence Livermore Nat'l Lab*., 131 F.3d 836, 839 (9th Cir. 1997). The Supreme Court has thus held that state actors for Eleventh Amendment purposes are not "persons" subject to liability for damages under section 1983. *Id*. Being a state actor is thus a prerequisite for taking shelter under the rule that officials sued in their official capacity are not "persons." And the 22nd District Agricultural Association is *not* a state actor. *ITSI TV Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1292 (9th Cir. 1993).

In any event, Plaintiffs have sued Shewmaker and Valdez in *both* their official and individual capacities. Defendants contend that this is a "pleading device" because Plaintiffs fail to allege any actionable activity separate from the District's vote. Mot. 10. But that is simply not true. The complaint contains several allegations of the unique involvement that Shewmaker and Valdez played in formulating and adopting the moratorium that continues to violate Plaintiffs' rights. *See, e.g.*, Compl. ¶¶ 25-26, 84-86, 88-90, 180. Again, it was Shewmaker and Valdez, who alone constituted the secret ad hoc committee, that investigated the safety of gun show events at the Venue. Compl. ¶ 84; Barvir Decl., Ex. 18 at 159-62. They alone prepared the report and recommendation that ultimately led the District to take formal action banishing gun shows from the Venue. Compl. ¶¶ 84, 88-89; Barvir Decl., Exs. 8-9, Ex. 18 at 159-62. Plaintiffs also allege that it was Shewmaker, who (1) made anti-gun-show

and anti-gun-culture remarks on and off the record, Compl. ¶¶ 86, 90; Barvir Decl., Ex. 11, Ex. 18 at 159, 162; Cheuvront Decl. ¶ 18; and (2) appointed himself and Valdez to the ad hoc contracts committee, Compl. ¶ 84. All these facts help sustain Plaintiffs' individual capacity claims against Shewmaker and Valdez.

Finally, Defendants' argument reflects a misunderstanding of the rule. "[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." *Hafer v. Melo*, 502 U.S. 21, 26 (1991). As a result, the fact that Plaintiffs' injury stems, in part, from the District's vote does take Plaintiffs' individual-capacity claims off the table.

### C.   Defendant Ross Cannot Invoke Sovereign Immunity for the Direct Role She Played in the Violation of Plaintiffs' Rights

Ross contends that Plaintiffs' claims against her fail because she lacks a necessary "specific connection" to the moratorium's enforcement. Mot. 11-12. Ross cites a handful of cases that hold that, under *Ex Parte Young*, 209 U.S. 123 (1908), a state official is entitled to sovereign immunity unless plaintiff pleads a "specific connection" between the official and the enforcement of the challenged act. *Id.* The argument fails for two reasons.

First, the "specific connection" requirement of *Ex Parte Young* applies only in *Ex Parte Young* cases, where plaintiffs rely on the limited exception to Eleventh Amendment sovereign immunity developed in that case. But Plaintiffs' suit is not based on *Ex Parte Young*. District Agricultural Associations are *local* (not state) actors; so the District and its officials are *not* entitled to Eleventh Amendment immunity. *ITSI*, 3 F.3d at 1292. Similarly, when Ross acts as supervisor of and delegates authority to the local District, she is not acting in her capacity as a state actor, and she too would not be entitled to Eleventh Amendment immunity.

In any event, Ross is a proper defendant because she *does* have sufficient connection to the moratorium. Her connection has a specific nexus and goes beyond a

24

generalized duty. *See Long v. Van De Kamp*, 961 F.2d 151, 152 (9th Cir. 1992). For the District could not have passed the moratorium but for the discretion that Ross, as Secretary of the Department of Food & Agriculture, expressly delegated to it. Compl. ¶¶ 59-60; Okita Decl., Ex. 1 at 69 (CDFA manual stating that the decision to contract with gun shows is left to the fair board and its community). This is more than a "generalized" duty or authority. It is a specific authority to decide whether to host gun shows on state property—authority the District abused.

Additionally, Food & Agriculture Code section 3965 authorizes the District, "with the approval of the department," to "[m]anage the affairs of the association." But it may not "without prior approval from the department," arrange for any any "[r]evenue-generating contracts involving hazardous activities, as determined by the department." Cal. Food & Agric. Code § 3965.1. The District has essentially determined that gun shows are a hazardous activity. But, by law, only the Department may make that determination. This amounts to directing, "in a binding fashion," the District's activities. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). So either the District acted beyond its authority or the Department is involved. Either implicates the Department, and thus Ross, creating a sufficient nexus between Ross and the District that goes beyond mere supervisory involvement.

## CONCLUSION

For these reasons, Plaintiffs ask this Court to treat the District's motion to dismiss and this opposition as cross-motions for summary judgment. They also ask the Court to deny the District's motion for summary judgment and grant Plaintiffs'. If the Court is not inclined to treat the District's motion as one for summary judgment, Plaintiffs ask the Court to deny the District's motion to dismiss in its entirety or, at least, grant Plaintiffs leave to amend.

Dated: April 17, 2019                          **MICHEL & ASSOCIATES, P.C.**

                                               */s/ Anna M. Barvir*
                                               Anna M. Barvir
                                               *Counsel for Plaintiffs*

PLAINTIFFS' MEMORANDUM OPPOSING MOTION TO DISMISS; SUPPORTING MSJ

## CERTIFICATE OF SERVICE

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *B & L Productions, Inc., et al. v. 22nd District Agricultural Association, et al.*
Case No.: 3:19-cv-00134 CAB (NLS)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Xavier Becerra
Attorney General of California
Paul Stein
Supervising Deputy Attorney General
Joshua M. Caplan
Deputy Attorney General
P. Patty Li
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
E-mail: patty.li@doj.ca.gov
   *Attorneys for Defendants*

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 17, 2019.

/s/ *Laura Palmerin*
Laura Palmerin